# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02665-MEH

HUMAN RIGHTS DEFENSE CENTER,

                Plaintiff,

v.

BOARD OF COUNTY
COMMISSIONERS FOR ADAMS
COUNTY, COLORADO; RICHARD
REIGENBORN, Sheriff, in his official
and individual capacities; CHRIS LAWS,
Jail Division Chief, in his individual
capacity; and DOES 1-10, in their
individual capacities,

                Defendants.

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Pursuant to Federal Rule of Civil Procedure 65, Human Rights Defense Center ("HRDC" or "Plaintiff"), by and through its undersigned counsel, hereby moves for a preliminary injunction immediately enjoining The Board of County Commissioners for Adams County, Colorado, Sheriff Richard Reigenborn, Jail Division Chief Chris Laws, and Does 1–10 (collectively, the "Defendants") from continuing to unconstitutionally deny HRDC's right to communicate critical and time-sensitive information to persons incarcerated in the Adams County Detention Facility (the "Jail") via the U.S. Mail.

HRDC seeks to provide incarcerated persons with reading materials regarding their legal and civil rights and options for accessing education and self-improvement while incarcerated. In recent months, HRDC has also sought to provide incarcerated persons critical information about the deadly COVID-19 pandemic, including, but not limited to, ways in which the virus is affecting

jail populations and measures incarcerated persons can take to mitigate the risk of themselves becoming infected.  Defendants have nonetheless refused to deliver dozens of HRDC's magazines sent via the U.S. Mail to persons incarcerated at the Jail – including recent HRDC publications concerning COVID-19 – thereby violating HRDC's First Amendment right to communicate information to these individuals.  In addition, Defendants have failed to provide HRDC adequate notice and an opportunity to challenge the Jail's censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment.  Defendants' serious and ongoing violations of the Constitution are causing HRDC irreparable harm.  As a settled matter of First Amendment law, the continued deprivation of HRDC's free-speech rights is precisely the type of irreparable harm that justifies preliminary injunctive relief.

HRDC's publications and correspondence pose no threat to the safety and security of the Jail, and in fact, are successfully distributed in jails and prisons all over the United States.  Indeed, HRDC's publications *promote* the health and safety of incarcerated persons, by, among other things, educating them about the dangers of COVID-19, the symptoms of the disease, and how to avoid catching and spreading it within the Jail.  HRDC has no alternative means of communicating with persons incarcerated at the Jail.  These incarcerated persons likewise have no alternative means of accessing information from HRDC about their health, safety or legal and civil rights— information that is crucially important to these individuals, especially during a global pandemic. Indeed, because of Defendants' arbitrary and capricious enforcement of their published mail policy, most individuals incarcerated in the Jail have extremely limited access to *any* reading and educational materials.

Accordingly, HRDC respectfully requests that this Court enter a preliminary injunction prohibiting Defendants, immediately and throughout this litigation, from (1) continuing to

arbitrarily and illegally censor the Plaintiff's written materials sent via U.S. Mail to incarcerated persons at the Jail; and (2) continuing to deny Plaintiff its right to Due Process of the Law, by failing to provide HRDC with adequate notice of the reasons for rejecting its correspondence and a meaningful and expeditious opportunity to appeal any such rejections.

**STATEMENT OF FACTS**

### A.  HRDC's Publications

The Human Rights Defense Center is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the state of Washington and with principal offices in Lake Worth, Florida.  *See* Declaration of Paul Wright ("Wright Decl.") ¶ 2. For more than 30 years, HRDC has focused its mission on public education, advocacy and outreach on behalf of, and for the purpose of assisting, incarcerated persons who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights.  *Id.*  HRDC accomplishes this mission through advocacy, litigation, and the publication and/or distribution of books, magazines and other information concerning prisons and the rights of incarcerated persons. *Id.*

HRDC publishes and distributes an award-winning, 72-page monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains news and analysis about prisons, jails, and other detention facilities, prisoners' rights, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals.  *Id.* ¶ 4.  HRDC has thousands of subscribers to its monthly magazine in the United States and abroad, including incarcerated persons, attorneys, journalists, public libraries, judges, and members of the general public.  *Id.* ¶ 10.  Since its creation in 1990, HRDC has sent its publications to prisoners and law librarians in more than 3,000 correctional facilities

3

across the United States, including death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado—the most secure prison in the United States.  *Id.* ¶ 11.  *Prison Legal News* is distributed to prisons and jails within the correctional systems of all 50 states, including to dozens of incarcerated persons housed in facilities in the state of Colorado.  *Id.*   HRDC also publishes a second monthly magazine, *Criminal Legal News*, which is 56 pages long.  This magazine focuses on review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues.  *Id.* ¶ 5.

In addition to the information it usually provides incarcerated persons, HRDC has recently added to its *Prison Legal News* publication important, time-sensitive information about the COVID-19 pandemic, with the aim of educating incarcerated persons about the dangers of COVID-19, the symptoms of the disease, and how to avoid catching and spreading it within the Jail.  *Id.* ¶¶ 7, 24.

HRDC has been mailing these important publications to persons incarcerated at the Jail, some of whom spend years in that facility.  *See id.* ¶ 16-18.  Yet Defendants maintain practices that unconstitutionally prevent HRDC from having these mailed materials reach the individuals incarcerated at the Jail.  *See id.* ¶¶ 15-26.

### B.  Defendants' Unconstitutional Mail Policies and Practices

According to the Adams County Detention Facilities [*sic*] Mail Policy (the "Mail Policy"):

> Local and non-local newspaper subscriptions may be ordered by family/friends with delivery directly to the facility by the news agency. Content that threatens security will be removed. Papers shall be disposed of 48 hours after arrival.

> The *ONLY* books that are allowed to be sent into the facility are paperback Bibles, Quran etc. or religious study guides. Books must be sent directly from publisher, church or book store. Fabric ribbons/bookmarks attached in

religious books will be removed prior to delivery to inmate. These books need to be *pre-approved* by kite from Mail Processor before the books arrive in our Facility. ** WE DO *NOT* ALLOW RECREATION OR LEISURE READING MATERIAL**

Adams    County    Detention    Facilities    Mail    Policy,    *available    at*

https://www.adamssheriff.org/sites/default/files/2018-03/inmate_mailing_instructions.pdf    (last

visited August 28, 2020).

In addition, the Jail's policy contains the below list of "Contraband Items":

1. Tobacco or flame producing devices
2. Stationary items (postage stamps, paper, envelopes, pens, pencils, stickers, address labels, musical greeting cards or greeting cards larger than 8x11)
3. Jewelry/rosary beads
4. Food /candy/gum
5. Phone cards
6. Polaroid photos
7. Glue or glued items
8. Laminated/plastic coated items
9. "Kisses" or any type of body fluid or unknown/foreign substance on the envelope or its contents (lipstick, lip gloss, perfumes, cosmetics, food or beverage stains)
10. Nudity in photos/drawings/cartoons (exposure of male/female buttocks, genitals or female breasts) including newborns/infants/children
11. Sexually explicit photo/drawings/cartoons
12. Gang material
13. Hand gestures in photos (peace sign or bunny ears - including by children)
14. Originals/photo copies of social security cards, birth/death certificates, drivers license, vehicle titles or bill of sale
15. Cash or personal checks
16. Homemade crafts or greeting cards with:

5

> a. Bows or ribbons
> b. Foam
> c. Tape
> d. Cords
> e. Metal or mirror pieces
> f. Glue
> g. Jewels or stones
> h. Unauthorized published material including copies/pages/clippings of books, magazines or newspapers
> 17. Any material which by its nature or content poses a [sic] security, good order or discipline of Detention Facility or facilitates criminal activity

*Id.* ¶ 15.  The policy's detailed list of contraband items does not include staples.

The policy also bans "recreation or leisure reading material" and only permits "paperback Bibles, Quran etc. or religious study guides."  Moreover, "[t]hese books need to be ***pre-approved*** by kite from Mail Processor before the books arrive in our Facility." *Id.*  (Emphasis in original).

### C.  Defendants' Censorship of HRDC's Mail

Beginning in June 2019, many of HRDC's mailings to incarcerated persons at the Jail have been returned to HRDC.  *Id.* ¶ 16.  Defendants have censored monthly issues of *Prison Legal News* and *Criminal Legal News* sent by HRDC to incarcerated persons held in the Jail.  *Id.* ¶¶ 17-19.  Defendants refused to deliver said items to the incarcerated persons and, in some instances, returned items to Plaintiff's office via the "Return to Sender" service of the United States Postal Service.  *Id.*  Defendants continue to censor these magazines.  *Id*.

Altogether, since June 2019, Plaintiff can identify at least thirty-two (32) issues of *Prison Legal News* and *Criminal Legal News* sent by HRDC to persons incarcerated at the Jail, which Defendants refused to deliver to HRDC's intended recipients.  *Id.* ¶ 18.  This mail includes eighteen (18) issues of *Prison Legal News* and fourteen (14) issues of *Criminal Legal News*.  *Id.* Some rejected magazines have been returned to HRDC's offices bearing a stamp with the message: "RETURN TO SENDER: Items Enclosed are NOT Accepted Through Facility Mail" and, at times,

the word "REFUSED".  *Id.* ¶ 19.  Two of the returned magazines also had handwritten notes in addition to the stamp: one simply stated "Staples", while the other stated "Staples – Didn't kite". *Id*.  Plaintiff believes that in addition to the HRDC magazines the Defendants have censored and returned to HRDC through the mail, Defendants are also censoring a substantial portion of numerous other magazines that HRDC has mailed to persons incarcerated in the Jail, without notifying HRDC (or its intended recipients) that Defendants have rejected the magazines or the reasons therefor.  *Id.* ¶ 20.  Defendants have not provided Plaintiff an opportunity to appeal the censorship of its magazines.  *Id.* ¶¶ 22-23.

Most recently, the Jail rejected HRDC's April 2020 edition of *Prison Legal News* – which contains important and time-sensitive information about COVID-19 – without providing the basis for such rejection or providing Plaintiff an opportunity to appeal the rejection.  *Id.* ¶¶ 18, 24.

By adopting and continuing, to this day, to apply such policies and practices, the Jail is unlawfully interfering with Plaintiff's protected expressive activities, and is denying Plaintiff Due Process of the Law.  HRDC intends to continue attempting to communicate with incarcerated persons confined in the Jail via the U.S. Mail. *id.* ¶ 21. Thus, unless the requested preliminary injunction is entered, Defendants' policies and practices will continue to violate HRDC's constitutionally-protected rights, causing irreparable harm.

**LEGAL STANDARD**

Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a preliminary injunction on notice to the adverse party.  Fed. R. Civ. P. 65.  "In determining whether to grant a preliminary injunction, a court must weigh (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the relative weight of the harm alleged

by the movant and the harm to the nonmoving party; and (4) the public interest." *Citizens United
v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d
1114, 1128 (10th Cir. 2013).

**ARGUMENT**

The Court should grant HRDC's motion and enter the requested injunctive relief, because:
(1) HRDC is likely to succeed on the merits of its claims; (2) HRDC is currently suffering and will
continue to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities
strongly weighs in HRDC's favor; and (4) the injunction sought herein is in the public interest.

**I.    HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

**1.    *First Amendment Claim***

A publisher's right to send publications and other correspondence to incarcerated persons
is clearly established.  "[T]here is no question that publishers who wish to communicate with those
who . . . willingly seek their point of view have a legitimate First Amendment interest in access to
prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (alterations added); *Prison Legal
News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (recognizing HRDC's "First Amendment right
to communicate with prisoners by mail"); *Cf. Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir.
2004) (finding a First Amendment right for incarcerated persons to *receive* information from
Prison Legal News while in prison). As the Supreme Court has held, "[p]rison walls do not form
a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482
U.S. 78, 84 (1987), nor do they bar others "from exercising *their own constitutional rights* by
reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407 (emphasis added).

Indeed, the interests of senders and their intended recipients are "inextricably meshed," and
"censorship of prisoner mail works a consequential restriction on the First and Fourteenth

8

Amendments rights of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409

(1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 413–14. "Whatever the

status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the

latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id*. at 408.

Further, HRDC's speech covers topics of great public concern – truthful, topical information about

the operations of our nation's penal institutions and the criminal justice system more broadly and,

recently, critical and time-sensitive information about COVID-19 – and therefore "occupies the

highest rung of the hierarchy of First Amendment values, and is entitled to special protection."

*Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v.

Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter

that is both newsworthy and of great public importance").

Accordingly, to withstand First Amendment scrutiny, a prison policy must be "reasonably

related to legitimate penological interests" under the four *Turner* factors. *See Boles v. Neet,* 486

F.3d 1177, 1181 (10th Cir. 2007). While this case involves the free speech rights of free persons,

and not of incarcerated persons, for purposes of this motion, HRDC assumes that the Court will

employ the *Turner* test as a means of ensuring that any injunctive relief incorporates due deference

for the exigencies of jail operation. *See, e.g.*, *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir.

2004). As evidenced below, HRDC is highly likely to prevail on each of the *Turner* factors with

regard to Defendants' censorship.

### (a) Defendants' Mail and Book Policies and Practices Are Not Rationally Related to Any Legitimate Penological Objectives.

The first factor a court considers in determining the validity of a prison regulation is

whether there is "a valid, rational connection between the prison regulation and the legitimate

governmental interest put forward to justify it." *Turner,* 482 U.S. at 89. This factor is "actually

more of an 'element' than a factor in the sense that it is not simply a consideration to be weighed but rather an essential requirement." *Boles*, 486 F.3d at 1181 (quotation omitted); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003).

Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (*quoting Turner*, 482 U.S. at 89–90). That is, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006); *see also Cox v. Denning,* No. 12-2571, 2014 U.S. Dist. LEXIS 137148, at *52 (D. Kan. Sep. 29, 2014) (granting summary judgment on plaintiff's First Amendment claim against defendants' postcard only policy). When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357 (internal citation and quotation marks omitted); *see also Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir. 1990) ("Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then *demonstrate* both that those specific interests are *the actual bases* for their policies and that the policies are reasonably related to the furtherance of the identified interests. An *evidentiary showing* is required as to each point." (Emphasis added)).

That is, while respectful of correctional officials' expertise, *Turner's* "reasonableness standard is not toothless." *Beard*, 548 U.S. at 535 (citing *Thornburgh*, 490 U.S. at 414) (internal quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[D]eference

does not imply abandonment or abdication of judicial review."). Rather, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) (emphasis in original); *see also Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989) ("[P]rison officials do not set constitutional standards by fiat." (alteration added)).

In the present case, Defendants' policy of censoring publications fails to advance any legitimate penological objective, rendering it irrational and arbitrary. In fact, Defendants' censorship of HRDC's magazines hampers the important penological objective of rehabilitating incarcerated persons. The U.S. Supreme Court has recognized that since "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (internal citation and alteration omitted). Further, the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation . . . ." *Martinez*, 416 U.S. at 412–13 (alteration added); *see also Cline v. Fox*, 319 F. Supp. 2d 685, 694 (N.D. W.Va. 2004) (access to reading material "may benefit inmates," and "[g]ood books . . . lift the spirit, improve the mind, enrich the human personality, and develop character" (alterations added; internal citation omitted)). As such, it is difficult to see how depriving an incarcerated person of knowledge about the outside world could help prepare this person for his or her eventual return to that world. *See Martinez*, 416 U.S. at 412 n.13.

Moreover, educating prisoners about the dangers of COVID-19, the symptoms of the disease, and how to avoid catching and spreading it in a carceral setting also promotes the Jail's penological interests in efficiency and preserving fiscal resources. The Jail is constitutionally required to provide adequate health care to the prisoners in its custody. *See, e.g., Estelle v. Gamble*,

11

42 U.S. 97 (1976).  Fewer cases of COVID-19 among the prisoners means less time and money spent on medical treatment by the Jail.

Because Defendants' mail policies and practices are not rationally related to any legitimate penological objectives, and in fact, hamper the crucial penological objective of rehabilitating incarcerated persons, the first *Turner* factor weighs in HRDC's favor.

### (b) There Are No Alternative Avenues for HRDC to Exercise Its First Amendment Right to Communicate Information to Persons Incarcerated in the Jail.

The second *Turner* factor concerns whether there exist alternative means to exercising the constitutional right in question.  The Supreme Court has made it clear that the absence of such alternative means may be seen as evidence that the prison regulations in question are unreasonable. *Beard*, 548 U.S. at 532 (*citing Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (holding that "no alternative means of communication" is "some evidence" that the prison regulations at bar were "unreasonable.")).

Defendants do not provide HRDC with any alternative means of effectively communicating information to incarcerated persons in the Jail.  HRDC cannot reasonably be expected to communicate its written speech to incarcerated persons by telephone or in-person with prisoners in each of the over 5,000 prisons and jail in America.  Even if prisoners have other ways to get information, HRDC's messages can be conveyed effectively only through print publications. *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if prisoners can obtain general information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines").  Under Defendants' current policy and practice, HRDC is left with no practical way to reach its intended audience.

**(c) Accommodating HRDC's First Amendment Rights Would Impose No Significant Burden on the Jail Authority's Officials, Other Incarcerated Persons, or Defendants' Allocation of Resources.**

The third *Turner* factor is the effect an accommodation of the constitutional right in question will have on incarcerated persons, prison staff, and on prison resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. at 414 n.14 (alteration added). In other words, the fact that numerous other institutions are effectively able to accommodate the constitutional right in question indicates that a particular restriction is not necessary.

Since its founding in 1990, HRDC has sent its materials to thousands of incarcerated persons nationwide. HRDC distributes its publications to correctional facilities across the United States, including the Federal Bureau of Prisons, which houses almost two hundred thousand inmates, without censorship. Indeed, HRDC sends its publications to the Administrative Maximum Facility ("ADX" or "Supermax") in Florence, Colorado - the most secure prison in the United States. Wright Decl. ¶ 11. Notably, HRDC is not aware of any state or federal prison where HRDC's magazines, books, or other correspondence have created a security problem. *Id.* ¶ 12. Even some jails have recognized, after rescinding publication bans, that allowing prisoners to read books and magazines is a "win-win" for everyone involved. *Prison Legal News v. Northwestern Reg'l Jail Auth.*, 2019 U.S. Dist. LEXIS 168591, at *9-10 (W.D. Va. Sept. 30, 2019). This is strong evidence that the third *Turner* factor favors HRDC, and an arbitrary barrier to HRDC's communications irrationally interferes with core protected speech.

**(d) Defendants' Mail Policy is an Exaggerated Response to Perceived Security Concerns.**

The final *Turner* factor is whether the regulation in question is an exaggerated response to

prison concerns. *Turner*, 482 U.S. at 90. Here, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ." *Id*. (alteration added). When a court finds that a restriction on an incarcerated person's constitutional rights is an "exaggerated response" to prison concerns, the restriction cannot stand. *Id*. at 97–99. As mentioned above, the fact that thousands of correctional facilities nationwide accept HRDC's materials strongly suggests that the Jail's censorship is an exaggerated response. *See, e.g.*, *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (final *Turner* factor favored publisher challenging county jail regulation where it was undisputed that publisher's magazine was already distributed in other California county jails). There is an easy, obvious alternative to Defendants' censorship: the Jail can effectuate a mail processing system consistent with those implemented by numerous other detention facilities across the country, including maximum security prisons, where publications are reviewed individually to determine whether they pose a risk to a penological objective.

The above analysis demonstrates that each of the *Turner* factors weighs in Plaintiff's favor. Therefore, Defendants' enforcement/implementation of its posted mail policy is an illegal intrusion on HRDC's First Amendment rights, and Plaintiff is likely to succeed on this claim.

### 2. *Due Process Claim*

The Supreme Court has long recognized that a publisher's right to communicate with incarcerated persons is rooted not only in the First Amendment, but in the Fourteenth Amendment as well. *See Martinez*, 416 U.S. at 417–18. The Due Process Clause requires a correctional institution, each time it censors an incoming publication, to provide both the incarcerated person and the sender with notice and an opportunity to challenge the censorship.

In *Jacklovich v. Simmons*, the Tenth Circuit held that prisons must provide senders of publications with procedural protections when mail is rejected. 392 F.3d at 433. "[T]he publisher's

14

rights must not be dependent on notifying the inmate." *Id*. (alteration added). Indeed, notice and an opportunity to be heard for the incarcerated person alone will not suffice because "[a]n inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication . . . ." *Montcalm Publishing Corporation v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (alterations added); *see also Jacklovich,* 392 F.3d at 433. The *Montcalm* Court stated that "providing a copy of [a rejection notice] to publishers of disapproved publications and allowing the publishers to respond in writing would pose a minimal burden on corrections officials." *Id.* (alteration added). "Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech." *Martin v. Kelley*, 803 F.2d 236, 244 (6th Cir. 1986) (alteration added).

Here, there is no question that Defendants have violated HRDC's due process rights. Defendants have returned only some of the publications to Plaintiff through the Postal Service, with a stamp indicating only "RETURN TO SENDER: Items Enclosed are NOT Accepted Through Facility Mail" and the notation "REFUSED", *see* Wright Decl. ¶ 19. Such cryptic and conclusory pronouncements fall far short of providing legally sufficient notice. On their face, the returned publications do not provide any *reason* for the rejection by explaining why each rejected (undelivered) issue of *Prison Legal News* and *Criminal Legal News* is "NOT Accepted Through Facility Mail."

Additionally, Defendants have utterly failed to provide HRDC with an opportunity to challenge their censorship decisions. *Id.* ¶ 23. An opportunity to be heard is a crucial, constitutionally-mandated chance to correct errors and challenge censorship decisions. *See Jacklovich*, 392 F.3d at 433-34. Providing notice and an opportunity to be heard is important because it allows publishers to investigate and challenge violations of their First Amendment

rights, as well as to assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm*, 80 F.3d at 108–09. If correctional facilities are allowed to simply throw away items that they choose not to deliver without any notice, it is impossible for publishers and incarcerated persons to know what materials are not being delivered and subsequently challenge the basis for the refusals. *See id.* at 109.

Correctional facilities in other jurisdictions provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. For instance, the Federal Bureau of Prisons has an explicit policy requiring it to notify incarcerated persons and publishers, identifying the specific articles or materials rejected and allowing independent review of a warden's rejection decision. *See Thornburgh*, 490 U.S. at 406; Federal Bureau of Prisons Program Statement P5266.11(2). This policy was upheld by the U.S. Supreme Court and acts as a model for other correctional facilities. *See Thornburgh*, 490 U.S. at 419.

Defendants in this case provided HRDC insufficient notice and no opportunity to challenge mail censorship decisions. Therefore, they violated HRDC's due process rights, and Plaintiff is likely to succeed on this claim.

**II.     DEFENDANTS' ONGOING CONSTITUTIONAL VIOLATIONS ARE CAUSING HRDC TO SUFFER IRREPARABLE HARM.**

It is well established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Citizens United*, 773 F.3d at 218; *see also Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001); *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). The violation of a First Amendment right is presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even

if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) (citation omitted). "Monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *see also Independence Inst. v. Gessler*, 936 F.Supp.2d 1256, 1281 (D. Colo. 2013) ("damages cannot replace the loss of protected First Amendment rights"). Further, "when a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (upon showing a likelihood of success on the merits in the First Amendment context, the other factors are satisfied; irreparable injury is deprivation of First Amendment rights; injury outweighs defendant's inability to enforce unconstitutional statute; public interest in free expression is protected).

Accordingly, courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g.*, *Jacklovich,* 392 F.3d at 428; *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail policy) (*quoting Elrod*, 427 U.S. at 373); *Prison Legal News v. Lehman*, 397 F.3d 692, 699–700 (9th Cir. 2005) (affirming grant of permanent injunction of prison ban on non-subscription bulk mail and catalogs requested by incarcerated person). The irreparable harm suffered by HRDC is concrete, severe, and ongoing. Defendants will continue to censor HRDC's mail to incarcerated persons without due process, thwarting HRDC's core protected speech on government policies, the civil and legal rights of incarcerated persons, jail conditions, and the criminal justice system. This is especially so because *Prison Legal News* reports on current newsworthy topics on a monthly basis. Wright Decl. ¶¶ 6-7. The passage of time saps the publication of its news value – especially with respect to the rapidly developing news concerning COVID-19. *Id.* Presumably,

other publishers have been or will be censored in the same way.  Accordingly, HRDC will continue to suffer irreparable harm without a preliminary injunction.

**III.    THE BALANCE OF EQUITIES STRONGLY WEIGHS IN HRDC'S FAVOR**

In ruling on a preliminary injunction motion, "a court must balance the equities to assess the harms facing both parties." *Direct Mktg. Ass'n v. Huber*, 2011 U.S. Dist. LEXIS 9589 at \*18 (D. Colo. 2011).    Importantly, in First Amendment cases, when an action "is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected." *Citizens United*, 773 F.3d at 218.

Here, any potential injuries to Defendants are minimal and speculative.  No great cost or expenditure of time is required to change the current policies to allow HRDC to deliver its magazines to incarcerated persons and afford constitutionally mandated due process; indeed, this is the very process that is used at the Federal Bureau of Prisons and by the majority of jails and prisons across the country.  Their experience demonstrates that there would be no substantial harm to Defendants if they were enjoined from enforcing the mail policy now in effect.

In contrast, as noted *supra*, the irreparable harm suffered by HRDC is concrete, severe, and ongoing.  Accordingly, the balance of equities tips in HRDC's favor given the irreparable harm suffered by HRDC in the absence of a preliminary injunction, and the minimal effort necessary to vindicate its rights under the First and Fourteenth Amendments.

**IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.**

As the Tenth Circuit has held, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).  This principle includes injunctions protecting First Amendment freedoms. *See e.g.*, *Cate,* 707 F.2d at 1190 (noting "[t]he strong public interest in protecting First Amendment values").  As set forth

above, there are substantial constitutional violations at issue here, and as such, the public interest is best served by the issuance of a preliminary injunction.

As discussed above, it is also in the public interest to allow prisoners access to reading materials while incarcerated. Reading materials enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in the jail. Wright Decl. ¶¶ 7, 13. In addition, reading allows detainees to keep their minds sharp, helping them to be productive citizens when released back into society. This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Martinez,* 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions…. It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.").

It also serves the immediate public interest of educating incarcerated persons about COVID-19, including how it is affecting jail populations, symptoms of the disease, and how incarcerated persons can avoid catching the virus and prevent it from spreading throughout the Jail. Wright Decl. ¶ 7.Maintaining prisoners' health is inherently beneficial to society, and, as mentioned above, promoting healthy practices saves the Jail's money and resources that would otherwise have to be spent on prisoners' medical treatment.

## V.    THE BOND REQUIREMENT SHOULD BE WAIVED.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond. *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113,

1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.") (*quoting Cal. ex. rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)); *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1061–62 (N.D. Cal. 2010) (waiving bond requirement for small non-profit organization suing government entity because bond would effectively deny access to judicial review), *vacated and remanded on other grounds by Ctr. For Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011).

Waiving the bond requirement is appropriate here because HRDC is a small non-profit organization of seventeen employees that would be unable to post anything more than a nominal bond. Wright Decl. ¶ 32. A bond requirement would effectively deny access to judicial review for HRDC, which is especially harmful because HRDC is alleging violations of its fundamental rights under the Constitution. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

The damage to Defendants, if any, of complying with the First and Fourteenth Amendments would be nominal, and thus Plaintiff should not be required to post a bond in this case.

## CONCLUSION

For the reasons set forth above, the Court should issue a preliminary injunction enjoining Defendants from continuing to violate Plaintiff's constitutionally protected rights by arbitrarily rejecting its mailed communications to prisoners incarcerated at the Jail, and without providing HRDC due process, and the Court should waive the bond requirement therefor.

Dated: September 1, 2020

Respectfully submitted,

/s/ *J. Matthew Thornton*

BALLARD SPAHR LLP
J. Matt Thornton, #48803
Steven D. Zansberg, #43660
1225 17th Street
Suite 2300
Denver, CO 80202
Telephone: (303) 376-2409
Fax: (303) 296-3956
thorntonj@ballardspahr.com
zansbergs@ballardspahr.com

HUMAN RIGHTS DEFENSE CENTER
Daniel Marshall*
Eric Taylor*
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Fax: (561) 828-8166

dmarshall@hrdc-law.org
etaylor@humanrightsdefensecenter.org

*Attorneys for Plaintiff Human Rights Defense Center*

**Pro hac vice* applications to be filed.