# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02665-PAB

HUMAN RIGHTS DEFENSE CENTER,

                              Plaintiff,

v.

BOARD OF COUNTY
COMMISSIONERS FOR ADAMS
COUNTY, COLORADO, et al.,

                              Defendants.

---

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

HRDC's motion seeks an order from this Court preliminarily enjoining Defendants' unconstitutional practice of selectively censoring publications HRDC sent – and intends to continue sending – to inmates in the Adams County Jail (the "Jail"), and refusing HRDC its clearly-established due process rights.

Defendants argue in response – without any supporting evidence – that Defendants "generally" distribute HRDC's publications to prisoners at the Jail, and that, until such time as Defendants censor *all* of HRDC's publications, Defendants cannot be found to have violated HRDC's First Amendment rights.[1]  (*See* Defs' Resp. to Pl.'s Mot. for Prelim. Injunction (Dkt. No. 16 ("Response") at 4.)  The legal premise of Defendants' argument is unfounded.  Censoring even just one HRDC publication, without a lawful justification for doing so, is sufficient to establish

---

[1]  Defendants do not dispute that HRDC, as a publisher, has legitimate rights to communicate to inmates under the First and Fourteenth Amendments.  Nor can they. *See, e.g.*, *Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974).

that Defendants violated HRDC's First Amendment rights.  However, in this case, HRDC has provided uncontested evidence that Defendants censored *at least 32 copies* of HRDC's publications, without any penological justification for doing so (let alone one that is permitted under the law).[2]  (*See* Dkt. No. 5-1 ("Wright Decl.") ¶¶ 12, 18.)

Defendants next argue, in what appears to be a post hoc, non-penological justification for rejecting HRDC's publications, that the intended recipients of such publications uniformly instructed Defendants to return them to HRDC, as evidenced by the word "refused" stamped on the return envelopes.  This argument is not only belied by the record, it defies common sense. First, nearly all of the envelopes returned to HRDC have the word "refused" on them – including those that also have the words "Addressee No Longer at this Address" stamped on them.  If an inmate is no longer in the Jail's custody, he or she clearly cannot "refuse" the mail.  Second, contrary to what Defendants suggest, it does not "stand to reason" that the notation "refused" means that the addressee, who requested the publication, subsequently decided not to accept it.[3] In fact, in this context, it is far more likely (i.e., it "stands to reason") that the "refusal" was a

---

[2]  Defendants reference in passing that some of HRDC's publications may have been rejected due to "staples."  Defendants' theory conflicts, however, with their representation that the Jail "generally" delivers all HRDC publications – because *all* issues of *Prison Legal News* and *Criminal Legal News* contain staples.  (*See* Wright Decl. ¶¶ 4-5.)  If "staples" were a legitimate and justifiable basis for Defendants to reject delivery, then presumably Defendants would deny *every issue* on that basis.  If Defendants had a legitimate penological concern about staples, they would also presumably list them as one of the categories of contraband prohibited by the Jail's mail policy.  Defendants did neither.

[3]  The one potential exception is a return envelope – which, notably, does not have the word "refused" affixed to it – on which the Jail's staff appears to have crossed out the words "Addressee no longer at this address" and written in, by hand, "per addressee request."  (*See* Ex. 1 to Wright Decl.)  At best, this shows that the Jail is capable of handwriting in an explanation for a rejection.  At worst, it is an example of an explanation that does not comport with the inmate's actual request.  Indeed, HRDC is left to wonder why the letter was twice stamped with a note saying that the addressee was no longer at the Jail, before the inmate purported to refuse its delivery.

decision by Jail staff – a conclusion corroborated by the fact that at least two prisoners expressed their gratitude and desire to receive even *more* HRDC materials just months before they supposedly "refused" to receive the magazines. *See* Exs. 1-4 to Supplemental Declaration of Paul Wright ("Suppl. Wright Decl.") ¶¶ 4-5.

Simply put, the undisputed evidence shows that the Jail is censoring *at least some* of HRDC's publications based on an official policy or practice, and the limited explanation Defendants have offered for those rejections do not satisfy the *Turner v. Safely* standard.

Turning to HRDC's due process claim, Defendants argue that simply returning to HRDC the rejected publication with what is, at best, a minimally-descriptive stamp affixed is sufficient to satisfy due process protections provided under the Fourteenth Amendment. Defendants are mistaken. In *Jacklovich v. Simmons*, the Tenth Circuit held that prisons must provide publishers with procedural protections when prisons reject their mail. 392 F.3d 420, 433 (10th Cir. 2004). Such protections include, in relevant part, reasonable notice and an opportunity to correct any legitimate issues raised by the prison. *See id.* Providing publishers notice and an opportunity to be heard is critically important because it allows them to investigate and challenge unconstitutional censorship, as well as assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm Publ. Corp. v. Black*, 80 F.3d 105, 108–09 (4th Cir. 1996); *see also Martin v. Kelley*, 803 F.2d 236, 244 (6th Cir. 1986). At a minimum, due process requires the correctional facility to inform the publisher of a rejected item of the *reason* for the rejection and clear instructions on how to challenge the decision. *See, e.g.*, *Human Rights Def. Ctr. v. Sw. Va. Reg'l Jail Auth.*, 396 F. Supp. 3d 607, 624 (holding that confiscation notices jail sent to HRDC were "plainly inadequate, stating no reason for the confiscation beyond simply

3

stating that the publication was not allowed"). Without such information, a publisher cannot effectively protect its legal rights, including its rights under the First Amendment. *See id.*

Here, there is no question that Defendants have violated HRDC's due process rights. Defendants admit that the publications they returned to HRDC did not state with sufficient specificity the reason for rejection or provide instructions on how to appeal. (Response at 5.) Indeed, it appears that Defendants themselves can only speculate about why the Jail may have refused some, but not all, of HRDC's publications, based solely on the stamps the Jail affixed to the return envelopes. At a minimum, Defendants concede that on at least one occasion (but likely many more) the Jail's return stamp was, at best, contradictory, and at worst, flat out wrong – such as when the Jail's return stamp reflected, in Defendants' view, that the inmate "refused" the mail, while also stating that the inmate was no longer in custody. This was not a one-time occurrence either; the problem persists to this day. HRDC continues to send mail to at least one inmate who is identified in the Jail's online booking system as being in custody but which the Jail has rejected, with a stamp that says "Addressee No Longer at this Address." *See* Suppl. Wright Decl. ¶¶ 6-7.

Despite these clear and ongoing issues, Defendants continue to deny they exist, and attempt instead to shift the blame onto HRDC, arguing that HRDC should have contacted the Jail as soon as the first publication was censored. Defendants' argument fails for at least three reasons.

First, it is not HRDC's burden to proactively contact the Jail every time the Jail rejects a publication in order to figure out the reason for that rejection and then, if necessary, piece together the procedure by which, in that instance, the Jail wants HRDC to appeal; it is Defendants' duty, under the Due Process Clause, to provide publishers that information. To date, the Jail has provided no information whatsoever about how to appeal, or even that an appeal is possible. In fact, the Jail's only published mail policy suggests that the Jail only allows *inmates* to appeal a

4

rejection, before the Jail sends a rejection notice to the publisher. (*See* https://www.adamssheriff.org/sites/default/files/2018-03/inmate_mailing_instructions.pdf ("After ten days, if an appeal has not been filed, the envelope/package will be returned to sender.")

Second, even if the Jail did have an appeal process, the Jail's method of communicating its rejection of a mailing does not give HRDC the information it would need to make any such appeal meaningful. As things currently stand, HRDC would essentially be required to guess why the Jail rejected the mail. The statement "RETURN TO SENDER: Items Enclosed are NOT Accepted Through Facility Mail," for example, is utterly devoid of the reason *why* the "items Enclosed are NOT Accepted." The stamp merely reflects the obvious: that the Jail rejected it. Even after reviewing Defendants' Response, HRDC *still* does not know *why* the Jail rejected its publications – or, for that matter, whether Defendants actually know the reason the Jail rejected the mailings.

And third, Defendants' argument presumes that, had HRDC contacted Defendants, Defendants would have taken appropriate remedial action. That presumption is not warranted here. Contrary to what Defendants suggest, contemporaneous with the filing of this lawsuit, HRDC contacted Defendants and invited them to discuss a potential resolution. *See* Exhibit 1 (Sept. 1, 2020 Letter from HRDC's Counsel to Defendants). To date, however, no such discussions have taken place.

Defendants conclude their Response with unsupported attacks on two of the factors this Court must consider when determining whether the grant an injunction: irreparable harm and balance of hardships.

Defendants' argument that HRDC is not suffering irreparable harm does not comport with the law. (Response at 6-7.) It is well established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Citizens United v.*

*Gessler*, 773 F.3d 200, 218 (10th Cir. 2014); *see also Kikumura v. Hurley,* 242 F.3d 950, 963 (10th

Cir. 2001); *Elrod v. Burns,* 427 U.S. 347, 373 (1976).  Moreover, HRDC continues to mail its

magazines to the Jail and thus the Jail's censorship is ongoing.  (Wright Decl. ¶ 29.)  Given

Defendants' reluctance to acknowledge a problem even exists, it seems certain that, absent

injunctive relief from this Court, Defendants' unjustified and unexplained censorship of HRDC's

publications will continue unabated.

Defendants' laches argument does not fare any better.  The fact that HRDC did not file suit

as soon as Defendants' censorship occurred does not mean that HRDC is not suffering irreparable

harm.  HRDC is a small organization with limited resources and few legal staff.  (Wright Decl. ¶¶

32-33.)  It is not able to immediately file a lawsuit whenever its publications are censored.  Nor

would that be prudent, as HRDC acknowledges that anomalies can occur within any given

correction facility, and that one or two rejected publications is not necessarily indicative of serious

constitutional issues.  As a general matter, HRDC gives correctional institutions the benefit of the

doubt, until it is able to complete a thorough investigation into the facility's practices and

concludes that such practices are unlawful.

In this instance, HRDC's investigation required it to analyze multiple rounds of returned

mailings to determine if the Jail was, in fact, unlawfully censoring HRDC's publications.  That

usually entails exchanging correspondence with and interviewing inmates.  However, in this

instance, HRDC was at all material times limited to exchanging communications by mail, due in

large part to the Covid-19 pandemic.  HRDC does not forfeit its constitutional rights merely

because it does due diligence to ensure that its claims are warranted before rushing to the

courthouse to file suit.

In any event, Defendants' argument fails because HRDC seeks prospective injunctive relief

6

to protect its rights in the future, and laches cannot bar such relief.  *See Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1005, n.32 (5th Cir. 1981) ("laches may not be used as a shield for future, independent violations of the law" because "[t]he concept of undue prejudice, an essential element in a defense of laches, is normally inapplicable when the relief is prospective"); *see also Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008) ("[L]aches . . . bar[s] only . . . retrospective damages, not to prospective relief.").  Thus, courts have not applied laches where plaintiffs seek prospective relief to address "ongoing" injury. *Garza v. Cty. of L.A.*, 918 F.2d 763, 772 (9th Cir. 1990); *Smith v. Clinton*, 687 F. Supp. 1310, 1312-13 (E.D. Ark. 1988) (action not barred by laches because "the injury alleged by the plaintiffs is continuing, suffered anew each time a State Representative election is held").  Here, HRDC seeks prospective relief from the Jail's ongoing constitutional violations and, thus, laches does not provide a basis to deny the preliminary injunction.

Finally, Defendants claim that an injunction would be a burdensome imposition on the Jail. (Response at 7.)  As an initial matter, despite purportedly interviewing numerous witnesses, Defendants do not attach a single document or declaration to their Response that supports this argument.  In any event, contrary to what Defendants represent, an injunction would not require the Jail to "suddenly and quickly overhaul the [Jail's] entire mail system."  The Jail would simply be required to deliver HRDC's magazines – as it claims it "generally" already does – and, if the Jail believes a legitimate reason justifies rejecting a publication, provide adequate due process (i.e., a notice of the specific reason for rejection and an opportunity to meaningfully appeal) to HRDC. Indeed, the Tenth Circuit has held that "providing adequate individualized notice to the publisher would appear to impose a minimal burden" on correctional facilities, such as the Jail.  *Jacklovich*, 392 F.3d at 434; *Montcalm Publishing Corp.*, 80 F.3d at 108-09 (holding that providing such

7

protections to publishers poses "a minimal burden on corrections officials").

## CONCLUSION

For these reasons, and the reasons set forth more fully in its motion, HRDC respectfully requests that this Court enter a preliminary injunction prohibiting Defendants, immediately and throughout this litigation, from (1) continuing to illegally censor HRDC's written materials sent via U.S. Mail to incarcerated persons at the Jail; and (2) continuing to deny HRDC its right to receive from the Jail adequate notice of the specific reason the Jail rejected HRDC's publications and a meaningful and expeditious opportunity to appeal any such rejections.

Dated: October 23, 2020                    Respectfully submitted,

*/s/ J. Matt Thornton*
BALLARD SPAHR LLP
J. Matt Thornton, #48803
Steven D. Zansberg, #43660
1225 17th Street
Suite 2300
Denver, CO 80202
Telephone: (303) 376-2409
Fax: (303) 296-3956
thorntonj@ballardspahr.com
zansbergs@ballardspahr.com

HUMAN RIGHTS DEFENSE CENTER
Daniel Marshall
Eric Taylor
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Fax: (561) 828-8166
dmarshall@hrdc-law.org
etaylor@humanrightsdefensecenter.org

*Attorneys for Plaintiff Human Rights Defense Center*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 23, 2020, a true and correct copy of the foregoing was served electronically, via the Court's CM/ECF notice system, addressed to:

Kerri Ann Booth
Adams County Attorney's Office-Brighton
4430 South Adams County Parkway
Suite C5000B
Brighton, CO 80601-8206

*/s/ Brandon Blessing*